Good morning, may it please the court. My name is John Marson and I'm here to represent the correctional officers who are the appellants and the plaintiffs in this matter. The problems at the Southern Nevada Correctional Center for Women did not arise because of the gender of the guards or the lieutenants who were in place. This is most particularly borne out by the findings by the Inspector General for the Nevada Department of Corrections who at page 8 of the appellee's reply brief indicates that there are four recommendations that he made in order to fix the problems that he had found at the facility. He said that the investigator position should be restored, that the management team should be replaced, that line supervisors should undergo additional training with an emphasis on team-building, and subordinate correctional employees should undergo training with an emphasis on female inmate con games. There are two essential distinctions between this case. Is it true that the actual reaction to this was simply to take over the prison? So it's so hard for me to demonstrate what anything that went on in that apparently horribly run private prison is relevant to what happened after the State decided to take over the prison and do it itself. That's, I think, perhaps one of the most important and easy way to distinguish this case from the myriad of prison and penal discretion cases that we've submitted to the court. The fact is that prior to the time that the Nevada Department of Corrections took back over this prison, it had been run by a private entity and had been run poorly. Indeed, Ms. Crawford, the Department of Corrections head, indicated that they were cutting corners and that there was an exorbitant budget that they couldn't live up to. And so, indeed, the things that happened prior to the time that the NDOC actually took over really have no bearing on whether or not it is proper to require some positions as being for women only when they are I mean, what happened at the changeover? Were the personnel completely changed? Or was there a continuation of the operations? The personnel were completely overhauled, Your Honor. I believe some applied for post-certification. I don't believe any of them were peace officer standard training certified prior to that time. And I believe some may have come over, but basically they cleaned house. And they certainly cleaned house with the management positions, including the lieutenant and on up. The management, I couldn't quite tell from the briefing and the record whether the three positions reserved for women were all of the lieutenant positions in this prison. Is that right? There were others? Yes, Your Honor. Do we know how many others? I'm sorry, off the top of my head, I don't, Your Honor. I believe at least six or more of the positions were. Six or more of the lieutenants? Yes, Your Honor. I believe so. Does that appear anywhere in the record? I don't believe it does, Your Honor. I would note it off the top of my head. Okay. So the two main distinctions are, I think, that, number one, that this prison was being run by a private facility and any issues related to things that had happened beforehand don't relate necessarily to the fact that there were males that were in management positions. Indeed, one of the, and this is in the record, one of the officers that was promoted to lieutenant, one of the women that applied for this position, stated that more females were compromised by the prisoners than males. And that is, of course, a factual issue, but it supports the notion that it is not. To my mind, as I say, this really couldn't possibly explain why there, how the BFOQ standards met because it was a different management and it had its own problems which were, you know, extensive. And really, and not only that, the reasons that are being given for, to justify the BFOQ are partly, you know, that men, male prisoners, male lieutenants are all going to engage in sexual abuse, but that's not the thrust of it. The thrust of it is a bunch of other, to my mind, fairly stereotypical explanations about how men are going to protect men and how women are going to be more empathetic and a whole bunch of things like that. So the prior history seems the least important thing in some ways. I would agree, Your Honor, and I think that those things that are raised by the Department of Corrections in support of their decision don't rise to the narrow exception that should be permitted for using sex or race because some of the cases we cited. Well, race can't be a BFOQ. Isn't that true? Or am I wrong about that? Race can be considered. I think from Bakke onward, the courts have permitted sex and race to be a part of the decision. I thought the statute doesn't allow race to be a BFOQ. Maybe I'm forgetting. You're talking about the Nevada statute, Your Honor? I'm talking about Title VII. Title VII. The prison also considered the 2004 NIC training that recommended gender-responsive strategies. Was that something they could rely on in exercising their determination as to what would make a safe prison? By all means. I believe that discretion as to safety, contraband, things of that nature, are things that prison officials are entitled to deference upon. But when it comes to most of the ‑‑ in fact, all of the cases that were cited by everyone, by both sides, relate to the line officers in the job, not the supervisory positions. Is there any supervisory case? I don't believe so, Your Honor. I couldn't find one. No. We didn't find it either, Your Honor. And to answer your question, I think that, yes, they are obviously permitted to use whatever information they have to enforce and encourage these policies. But at the supervisory level, there's no evidence either before this court, before the district court who granted summary judgment, or in case law that supports the idea that anyone but line item officers should be forced to be just ‑‑ I'm sorry. So that wasn't in the NIC training. I'm sorry, Your Honor? That wasn't in the NIC training recommendation. No, it was not. I'm sorry about that. Then there was some testimony that this particular supervisory role would be in the mix with the actual prisoners to supervise, to see that everything was happening right. Is that correct? Yes. Undoubtedly, everyone from all supervisory positions, from the warden on down, walk around the prison. They interact with the lower level supervisors. They do speak to prisoners and they do, you know, they do walk around the prison. But there's no case that would support the idea of excluding all supervisors just because they happen to be men. There are less restrictive ways to deal with, you know, certain issues that may come up in a prison. But what's really the difference between the contact cases, which seem to defer to the decision that you could base the gender of the official in prisons because they're having contact or they were contact, and in this case where there's some contact with them? Why is there a bright line between this sort of supervisor who's not just stuck in the office and a contact position? Well, I'm not sure that any of the cases deal with just contact. There are cases, of course, that deal with cross-gender searches, and there are some pretty clear distinctions by two of the members of this panel that have written opinions on those areas. But contact itself, I don't think there's anything that supports the idea that prisoners can expect to have no contact from the opposite gender. A couple of the cases that were cited, they would put up for 15 minutes a barrier. So while women, female prisoners changed or had other private things that they needed to address, they had a short time that they could do so. But in balancing out things, of course, there's... But in any event, that rationale is not the thrust of what has been the justifications that have been advanced here. I mean, it's said somewhat in passing, but the thrust of them, as I understand it, is two. One is that male supervisors are going to protect male wrongdoers who are involved in sexual abuse or other bad conduct with regard to bringing in contraband in order to get sexual favors or things like that. And the other is that it is the nature of womanhood is more conducive to dealing with the complexities and differences of female inmates. That they understand the emotional outbreaks better, and that they are better capable of understanding the management of women, meaning inmates, and that when people become emotional, the women are going to be able to deal with them and the men can't, and so on. Those seems to me to be the two primary justifications offered. And I suppose that's perhaps because the contact issues could be dealt with in other ways. So do you want to address those two? Your Honor, we've briefed the issue. I think that those are unsupportable reasons to require that only females can apply for these positions. I just think the law abhors that rationale. I think that it's sexist and it violates Title VII. It sounds a lot like the early BFOQ cases about flight attendants and nurses and so on, which... Indeed, Your Honor. Long ago were decided is not what BFOQs have been. Could I ask you about the de minimis aspect? And asking you, I like it. You know, somehow the district judge and now one or perhaps both parties have persistently misspelled that Latin phrase. Yes. It's not de minimus. Right. De minimis. It was very aggravating. Let's stick with the original phrase. De minimis. You have nine lieutenants of whom six are men and three are women. Supposing the State has said we need at least one woman at that level, would you say that was a violation of Title VII? I would, Your Honor. You're an absolutist. And I would blame it on the spell check, too, Your Honor. Well, there are two things, Your Honor. I think, first of all, the de minimis defense relates to the impact on the officers. The cases of Tharp and Rubino speak of minimal changes to the officers' schedules, just a slight change in their schedules. They indicated that if it deals with promotion or impacts them monetarily, that those can be more than de minimis. Having a single position held open only for a woman because they want to have ‑‑ I guess it depends on what that position is, Your Honor. If this supervisor was at all times in the women's showers or was in some place where ‑‑ Wait a minute. It would still not ‑‑ it seems to me it's still a discrimination based on sex that is recognizable under Title VII, but the BFOQ applies if it applies. But I don't understand how it could be de minimis. I'm saying two different things, Your Honor. I agree. I don't think de minimis applies to this because I think the de minimis analysis relates to the weighing of these different factors against the impact on the person that claims the discrimination. And I think the Rubino and Tharp cases speak of only minimal ‑‑ In both of those cases, it was not a question of a position being foreclosed. Right. It was that while you're in this position, you have to do this shift instead of that shift. That's exactly right, Your Honor. The challenge was not in either of those cases by people who were denied jobs. They were by people who were in the jobs who were complaining that the women, in order to, in some nuanced way, deal with the needs of women prisoners for privacy and so on, to give them something that was then viewed or to place them in assignments which were then viewed as preferential. But it was nothing about the level of their employment or their pay or their benefits or anything else. I agree, Your Honor. And I think in trying to answer Judge Noonan's question, it was a two‑parter, which is, one is can there be an exception for just a single position. And I guess I'm pulling away from the absolutist point of view, which is if the position required certain things that impact greatly the privacy concerns of the women involved or impact safety or contraband, then maybe yes. Maybe yes, it would be de minimis, or maybe yes, it could be a BFOQ. The second, Your Honor, BFOQ. So what deference do we give then to the prison administrator's determination of that, that in fact a woman is needed for these specific reasons? I mean, the district court essentially said we show a lot of deference to the prison administration's determination, and here they went through a reasoned process to do it. You're suggesting if that's okay, that creates a BFOQ. That's what the district court said the prison did here. I think the case law with regard to the discretion of the prison officials relates mostly to the issues of safety and contraband. When an official is making a decision as to trying to encourage certain positions to be held by one sex or the other because of these generalizations about how they emotionally interact with the prisoners, I don't think any deference should be given for those grounds. Well, they gave safety rationales as well, perhaps conclusory, but they were nevertheless based on safety. Rationales can be used to support any position, but I don't think there's any need. The rationale was you could have varying ideas about how persuasive that rationale was, but the court said that's enough, it's prison, we defer. Why isn't it the same here? Well, I guess the question is how far do we look into this and how far do we look into the facts of what is before the court and how much discretion would we give to a prison official in making the decision based on what the record is. In this case, I don't think it comes close to supporting just allowing unfettered discretion by an official to make these kind of decisions. The records doesn't support that there was any danger. In fact, the record supports that it was the other way around, that they were concerned about the correctional officers being, you know, impacted by the prisoners. But they saw with male all the way up the line that the correctional officers weren't controlled and that was their argument, that only if you had women really supervising that the men would be controlled. Well, the facts of that case, I think, Your Honor, that that prison was much worse a disaster than the Southern Nevada Women's Correctional Center was before the State took it over. And under those facts, that may be acceptable. Under these facts, I don't think there's any basis in the record to support that. But also in Daughter, I mean, you have prison guards and you have prisoners. It's one thing to say you can't control the prisoners and they may attack the women guards. It's another thing to say that we can't control our own employees, which is at least part of the argument here. We're going to hire people and we're not going to be able to control them. Indeed, that was one of the recommendations by the inspector general, saying that we need to train both our management and the officers better with ethical issues and with how to manage the prisoners. To accept the fact that male prison guards are going to attack women prisoners rather than trying to see that they don't do it seems like a strange way to run a prison. Agreed, Your Honor. If you have no further questions, I would ask to reserve a couple of minutes. Thank you. Your time is already two minutes over. Okay. Thank you. Good morning, Your Honors. May it please the Court. Roger Mattson appearing on behalf of the defendant's appellees in this matter. If I may, I'd like to address the plaintiff's appellants as correctional employees and the defendant's appellees as prison administrators, just for simplicity purposes. And I'd like to start off by addressing the first question that was brought about in terms of the prior events that were taking place at the prison. Go ahead. I'd like you at some point to tell us whether you're supporting a de minimis holding of the district court. You can do it now or you can do it later. Okay. I will address the prior events first, and then I'll go into the de minimis. First of all, what I want to make clear and hopefully clarify to this Court is how it works, at least it was working at the time in the state of Nevada. And that is a private company was operating the prison, basically out of a contract from the Nevada Department of Corrections. And so the Nevada Department of Corrections still has to oversee what's going on there. And so that puts into context, I think, why the prior events that were occurring there are very important. What had happened where there were concerns, inmate grievances, coming to the director at the time, Jackie Crawford, saying there's misconduct going on here. And then one of the most telling events that took place, a very serious event that became publicized, was the impregnation of a female inmate by an employee. Once this became high profile, the governor at the time, as well as legislators, were putting pressure on the Nevada Department of Corrections and specifically the director to do something about it. Right. And they did something about it. They did the right thing, which was to take over the prison. Right. And so she decided to take over the prison. And in order to do this, she had to come up with a plan, a decision-making process, to try to do something to take this prison under control. It was completely out of control. It was a poisoned atmosphere. There was sex and drugs going on on a daily basis.  And based on her judgment, what she took from that report, and she took from her studies and training with the National Institute of Corrections, which is affiliated with the Federal Bureau of Prisons and U.S. Department of Justice, taking the report and the training and her experience and many discussions with prison administrators, she determined that this was some way to try to resolve the disaster. One thing I'm not clear about from your record, well, two things. One is what are the facts with regard to how many of the positions, the lieutenants in this prison had jobs reserved for women? There were three positions. I'm only aware of one other position, which involved an employee that was with the private company, and she was a female as well. So you're saying that all of the public positions were resolved. All of the correctional lieutenant positions. That's what I thought. There weren't six. There were three. There were a total of three. Correct. Okay. So all of them were reserved for women. Right. Okay. Second of all, was there – it was confusing to me whether there was a similar restriction placed with regard to line officers. But I surmise not. That's true. It was not. The director at the time, she didn't want to go globally on this. She wanted to keep it to the higher ranking officers. Is there any case which has ever – or the training from the national group that suggests that supervisors should be restricted by sex rather than line people? The report and studies of the National Institute of Correction specifically recommends that there be same-sex supervision for female inmates because it's more like – They mean supervising the inmates. They don't mean supervising the people who are supervising the inmates. Yeah. I'm sort of struggling with the idea of what makes a lieutenant's gender make a difference for monitoring other employees and how those employees run the prison. I mean, there's – or are dealing with the inmates. I mean, so this is a supervisory position. The direct reports of people they're interfacing with are other prison officials who are then themselves dealing with the inmates. What's the gender issue there? That's what I'm struggling with. The gender issue was that there was a complete leadership void at the time, and males were in leadership, to use a phrase, good old boys system at the time, and it was a male-run facility. And as the report states, there was a complete leadership void, which was they were allowing these things to go on. And therefore, there's an assumption that all men are going to let the – are going to not be able to supervise employees because they're going to let stuff go on. I mean, that's what you're saying. It's really very hard to characterize it in any other way. What I'm saying, Your Honor, is that through the substantial deference that the director at the time is entitled to, based on the opinion from this court, Rubino, Torres from the Seventh Circuit, and Everson from the Sixth Circuit, when they have to make these decisions, they're difficult. I understand that. But don't they need some basis that is not as a gender-based stereotype about behavior and emotions and the way people – and what's inherent in womanhood and what's inherent in manhood in terms of behavioral characteristics? Don't they need something other than that? The basis for her making this decision was the inspector general report, which said that there were too many males in the prison, these things were going on, and she felt that something needed to be done with the leadership. What she said in explaining herself were things like that women have an innate ability to manage women. What is that innate ability? To understanding some of the emotional outbreaks, understanding sometimes with women I don't believe they can be manipulated. Then she said that the – what kind of emotional outbreaks? Crying. Sometimes they go into these screaming matches with each other. And why can female attendants – they're just more patient. They're more maternal. They have an instinct and an innate ability to discern what is real and what isn't. If a woman is crying, you know there's an emotional outbreak that the female officers were better able to discern what's really happening here. That – let's see. If there are women who are crying, I don't think a woman would confide in a male counterpart. Men's emotions, you know, they kind of cut them off and they don't cry and they have emotional outbreaks. It's a whole different environment. Those are her reasons. Is there any – can we – is there any case law that allows those kinds of reasons to support BFOQs? Well, I think that Rubino from this court, Torres from the Seventh Circuit, and Everson from the Sixth Circuit provide for BFOQ in these circumstances. But not for those reasons. They had specific reasons that were backed up by something other than somebody's intuition about what's basically female and basically male, which is what the – all of Title VII was designed to get behind and to not allow to be – if we allow this, then why don't we allow – go back to the airline cases and do them over and say that the notion that flight attendants are more empathetic to passengers is a BFOQ. That's what they were arguing. May I address the fact that there's a legitimate proxy here, which goes along with that? If I may, let me give you some examples of why the very manhood could affect their qualifications. And these – this very manhood issue was addressed in Torres out of the Second Circuit and Everson out of the Sixth Circuit. Let me give you some examples. For example, when there are males in female facilities, there have to be modesty screens. I'm sorry? There has to be modesty screens when there are males working in female facilities. And what this does is it creates a problem because they're not able to fully do surveillance on these inmates when they're, for example, in the shower or using the toilet and things like that. But the lieutenants aren't doing that. And the people who are doing it, you're saying, are not being restricted. The lieutenants do have contact with the inmates. They have to go down and supervise what's going on. They do have exposure to them in the shower area, in the cells, and so forth. And correctional employees admit that fact. I believe they stated that here today. But the fact that they have to have these modesty screens and aren't able to fully Another example. If the primary, I guess, so the primary surveillance is not being done by the lieutenants. It's being done by the line officers. And so I take it that the opposing counsel's argument is, well, when the lieutenants come in just to supervise, then there are, then you can have the modesty screens and that would be a less restrictive alternative for making the supervisors be gender specific. With respect to there being a reasonable alternative, which this court talked about in Jordan v. Gardner, with correctional lieutenants, as you know, there are only three or four in each correctional facility. And there's only one correctional lieutenant working per shift. So, for example, one for day shift, one for swing shift, one for graveyard. And if you're fortunate enough to have a fourth, they can act as a reserve that will help out for things such as leave and days off. That being said, it's obvious that there can't be any rearrangement when there are only, there's only one correctional lieutenant. I have a question. Did Jackie Crawford, who was the person who made this decision, ever give this reason? Did she ever give the reason that there About the security screens and so on? Our expert who worked I'm not asking about your expert. I'm asking about the person who made the decision. Did she ever give that reason? Well, I want to make it clear that this was a decision made by prison administrators, which involved several different people. Of course, she was But did she ever give that reason? I don't recall specifically. She didn't. What were other decision makers who were involved in that decision? Did they rely on the ground that you're now discussing with us? As you see in an affidavit from Glenn Warden, who was an assistant to Jackie Crawford, he brings this point across that But he was an expert. He was not. He was put forward as an expert, not as a decision maker. And he gave this as his professional opinion, but not as a reason that was a basis for the decision. Well, he's basing his opinions on the report and the National Institute of Corrections and all the facts and circumstances in this case. What about the de minimis issue? Thank you. As this court stated in Robino and as the Eighth Circuit stated in THARP, the de minimis restriction defense alone is enough to dispose of a Title VII action in favor of an employer. Correctional employees completely failed to oppose this defense at the district court level. And the very first ruling that the district court found and made was that, in fact, the correctional employees failed to oppose this defense. Based on the case of Robino and THARP, that's it. This case is over. We don't even get to the BFOQ defense. But the cases don't apply. I mean, they're not about this. They're not about whether they specifically say they're not about it. They say we're not talking about promotions or hiring. And the people who were challenging it were not people who were denied promotions or hiring. There were people in parallel positions complaining about, you know, fairly de minimis things, i.e., I want to work a different shift. Prison administrators submit that this can be, these cases can apply to the situation, even though it's not a reassignment case. It's a, let's say, a vacancy that's being filled. Because it's whether or not there's a restriction and whether it's de minimis. Was there a restriction? Sure, there were three opportunities that they weren't able to have. But they weren't terminated because of these three positions. They weren't demoted because of these three positions. There was no pay reduction. He wanted this job, he says, because it was near where he lived. And he had to wait quite a while until he got another job in the same level, and apparently it wasn't in where he wanted to work. And besides, he at least lost income for some period of time compared to when he would have gotten a job because that's where the vacancy was. So how's that de minimis? You tell somebody who loses six months of more pay that Title VII doesn't care? As this Court ruled in Rubino and, again, in Tharp, the Eighth Circuit, it was stated that correctional employees, they don't have a right to choose what assignment they have within the prison. They also don't have the right to choose what prison they work in. And do they have a right to not lose pay for six months because they're foreclosed from a position? Your Honor, there were 31 positions available. This was three out of 31 positions. And I think it's very telling evidence that out of the 28 other opportunities between 2003 and 2005, none of the correctional employees applied for any of the 28 other opportunities that were not gender-specific. I think that's very telling evidence here. Furthermore, if we take these positions and make them non-gender-specific. Let me ask you something. Was Mr. Stout working in this prison before he was applied to be a lieutenant? No. He was working somewhere else? Correct. Okay. I see my time is up. Okay. Thank you. Thank you very much. Thank you for your argument. I keep doing this, but I'll give you one minute, really one minute. You went over your time. And I'm not sure if there's anything you need to say, so you should consider whether you really do. Unless the Court has any questions, I have nothing to respond to. Okay. Thank you very much. Thank you very much. The case of Briner v. Nevada Department of Corrections is submitted, and we will recess until tomorrow. Thank you very much. Thank you both for your argument.
judges: Noonan, Berzon, Ikuta